UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONNELL DAVIS,<br><br>         Plaintiff,<br><br>v.<br><br>SAIDRO *et al.*,<br><br>         Defendants. | Case No.: 18-CV-2838-LAB(WVG)<br><br>**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**[Doc. No. 12.]** |

  Plaintiff, a California state prisoner proceeding pro se, brought this civil rights action under 42 U.S.C. § 1983. Pending before the Court is Defendants' motion for summary judgment on the Complaint's sole claim for violation of the Eighth Amendment. As explained below, this Court RECOMMENDS the motion be GRANTED, that judgment be entered in Defendants' favor, and that the case be closed.

/ / /

/ / /

/ / /

/ / /

/ / /

# I. STATEMENTS OF FACTS

## A. Defendants' Statement of Facts[1]

On October 2, 2013, Plaintiff was diagnosed with deep vein thrombosis (DVT) in his lower right leg. DVT is the formation of a blood clot in a deep vein. DVT may cause symptoms such as pain and swelling in the affected area, and it also carries the risk of pulmonary embolism (PE), whereby the clot detaches and becomes lodged in an artery that supplies blood to the lungs. PE may be fatal. Five days after the DVT diagnosis, Plaintiff was diagnosed with and treated for PE. Since that time, Plaintiff has been on warfarin therapy to reduce the risk of recurring DVT or PE.

The goal of warfarin therapy is to decrease the tendency of the patient's blood to clot, thereby helping to prevent the formation of clots that could lead to DVT or PE. However, care must be taken that the patient's blood does not become too slow to clot. Otherwise, the patient would be at risk for bleeding. Therefore, the blood's ability to clot is checked regularly and the dosage of warfarin adjusted accordingly. Prothrombin time (PT) is a measure of the time it takes a clot to form. PT is usually expressed as a ratio to a control sample, the International Normalization Ratio (INR). The average person not on warfarin would have an INR of 1.0. The longer it takes the blood to clot, the higher the INR. The target (therapeutic) range for a patient on warfarin therapy is generally between 2.0 and 3.0. If the level is lower (subtherapeutic), the patient is at an increased risk of clotting and an embolism; if the level is higher (supratherapeutic), the patient is at an increased risk of bleeding.

---

[1] As of this writing, Plaintiff has not filed an opposition to the MSJ despite two extensions of the deadline to do so. (See Doc. Nos. 16, 20.) When the most recent deadline expired on January 19, 2021 (Doc. No. 20), Plaintiff filed neither an opposition nor a request for extension of time as he had filed twice previously. (See Doc. Nos. 15, 19.) Because Plaintiff did not file an opposition to the MSJ, Defendants' version of facts stands as the only set of undisputed material facts for purposes of this R&R.

Under guidelines issued by the California Correctional Health Care Services, treating physicians are to consider placing a hold on warfarin therapy for any patient whose INR exceeds 4.0. As long as the patient shows no signs of bleeding, physicians may increase the frequency of INR testing and resume warfarin therapy once the INR returns to the therapeutic range. However, if a patient shows signs of serious bleeding, health care providers are advised to withhold warfarin and transfer the patient to a higher level of care.

In May 2015, Defendant Dr. Saidro became Plaintiff's primary care physician at the Richard J. Donovan Correctional Facility ("Donovan" or RJD"). She had primary responsibility for Plaintiff's health care, including managing his warfarin therapy in conjunction with the anticoagulation clinic at RJD.

Dr. Dulatre is a staff pharmacist at Donovan. Since 2015, he has been the manager of the RJD anticoagulation clinic. He manages the anticoagulation medications of inmates by regular appointments, medical record review, and collaboration with other medical providers at Donovan to optimize patients' drug therapy. Dr. Dulatre is responsible for determining the appropriate dosages of anticoagulants, including warfarin, based on his regular monitoring of his patients' INR levels.

On March 1, 2016, a blood test showed that Plaintiff had an INR of 4.1. Dr. Dulatre received an automated alert that Plaintiff's INR was excessively high. He consequently ordered a one-day hold of Plaintiff's warfarin in an effort to return his INR to the therapeutic range. He scheduled Plaintiff for a follow-up appointment on March 8, 2016 and a blood draw on March 9, 2016 to recheck Plaintiff's INR. However, Plaintiff refused to go to the March 8 appointment and failed to go to the March 9 lab appointment. Dr. Dulatre rescheduled the blood draw for March 11. Plaintiff also failed to show for that appointment.

Dr. Dulatre became concerned that it was dangerous to continue Plaintiff on warfarin, since Plaintiff's refusals of blood draws made it impossible to determine whether the high March 1 INR level had returned to the therapeutic range. After Plaintiff failed to show for his rescheduled blood draw on March 11, Dr. Dulatre called Dr. Saidro and

expressed his concerns. Dr. Saidro had Plaintiff summoned to the clinic, where a nurse explained to Plaintiff the reasons he needed to have his blood drawn. Plaintiff again refused a blood draw and refused to sign a Refusal of Medical Treatment form. After the nurse reported to Dr. Saidro that Plaintiff again refused a blood draw, Dr. Saidro ordered a stop to Plaintiff's warfarin. Plaintiff's warfarin was stopped that day.[2] Dr. Saidro planned to restart Plaintiff's warfarin once his INR could be verified as no longer excessively high.

Plaintiff then prepared a Form 7362 Request for Medical Treatment that he dated March 11, 2016, but which was not received until March 12 and not reviewed until March 13. In it, Plaintiff claimed he was experiencing bloody stool and bruising on his thighs. Both are symptoms of bleeding and are signs that Plaintiff's blood was taking too long to clot. Plaintiff was seen in the clinic on March 13 because these symptoms required urgent care. A nurse evaluated Plaintiff and noted rapid heartbeat and rapid breathing. She consulted Dr. Bates, the on-call physician in the clinic at the time. Dr. Bates ordered Plaintiff to be taken to the hospital to rule out pulmonary embolism.

Medical records show that Plaintiff was first taken to Sharp Chula Vista hospital. X-rays and a CT scan of the chest were both unremarkable and found both of Plaintiff's lungs were clear. Plaintiff was then transferred to Tri-City Hospital for further care. The admitting physician noted that Plaintiff reported maroon stool the day before, but that was not verified. Plaintiff also reported lower chest/upper abdomen pain. The physician further noted that "[i]t is unclear if there is really much to do," that he "will hold off any anticoagulants for now" as a result of Plaintiff's report of maroon stool and that Plaintiff "has obviously ruled out for a PE and his presentation is not consistent with a pulmonary embolism either."

Further tests, including an ultrasound on March 14 and a stress test on March 15 were also unremarkable. Plaintiff was discharged on March 15, 2016. The discharge

---

[2] Davis claims he did not receive warfarin beginning March 9, 2016. Medical records show that Davis did receive warfarin on March 9 and 10.

summary notes that Plaintiff's complaint of shortness of breath had resolved and there was no evidence of bleeding during his hospitalization. His complaint of chest and abdominal pain was deemed "likely musculoskeletal" and improved.

Plaintiff returned to Donovan early in the morning of March 16, 2016. The intake nurse noted that all diagnostics at the hospital had negative findings. Plaintiff refused any further assessment or taking of vitals upon his return to Donovan, stating he was tired and wanted to return to his cell. He signed a refusal of treatment form. The physician on duty in the clinic scheduled a follow-up appointment with Dr. Saidro.

On March 21, 2016, Dr. Saidro saw Plaintiff for a post-hospitalization follow-up. Dr. Saidro noted that Plaintiff went to the hospital with shortness of breath and out of concern that he was having a pulmonary embolism, but all tests were negative or unremarkable. Dr. Saidro verified that Plaintiff had provided a blood draw and that his INR was no longer excessively high. Dr. Saidro therefore ordered resumption of Plaintiff's warfarin treatment on that date. Plaintiff claims that Dr. Saidro told him she stopped his warfarin because he would not go for a blood draw, and that Plaintiff had "to learn to do as I say." However, Dr. Saidro denies using such language.

Dr. Dulatre restarted Plaintiff's warfarin on March 21. Dr. Dulatre saw Plaintiff on March 24 to discuss restarting his warfarin. Plaintiff told Dr. Dulatre he was unhappy that his warfarin was stopped. Plaintiff claims that Dr. Dulatre apologized for stopping the warfarin, said that doing so was against plan, and that Dr. Saidro told him to stop it in order to teach Plaintiff to do as she says. However, Dr. Dulatre denies these statements.

**C.   Procedural Background**

Plaintiff filed the operative Complaint on December 17, 2018, alleging a single claim under 42 U.S.C. § 1983, claiming two prison doctors were deliberately indifferent to his serious medical needs. Defendants filed an Answer on April 15, 2019, and discovery commenced on April 16, 2019 when the Scheduling Order issued. The Court also held two settlement conferences, but the case did not settle. Defendants jointly filed the pending summary judgment motion on April 30, 2020. On September 23, 2020 and November 23,

2020, Plaintiff was granted two extensions to file an opposition. However, Plaintiff has not filed an opposition as of the time of this filing, and the January 19, 2021 deadline for doing so has passed. He also has not filed a third request for extension of the opposition deadline.

## II. LEGAL STANDARD

A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and . . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Prison Legal News v. Lehman*, 397 F.3d 692, 698 (9th Cir. 2005). The moving party bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the file which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party may not rely solely on conclusory allegations unsupported by factual data. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). The Court must examine the evidence in the light most favorable to the nonmoving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654 (1962).

When the nonmoving party bears the burden of proving the claim or defense at trial, "the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial." *FTC v. Omics Grp.*, 374 F. Supp. 3d 994, 1008 (D. Nev. 2019) (citing *Celotex Corp.*, 477 U.S. at 323-24).

## III. DISCUSSION

**A. Because There is No Genuine Dispute of Material Fact Whether Defendants Violated Plaintiff's Constitutional Right to Medical Care, Defendants are Entitled to Summary Judgment**

Defendants move for summary judgment on Plaintiff's sole claim brought under the theory that Defendants violated Plaintiff's Eighth Amendment rights through alleged deliberate indifference to Plaintiff's serious medical needs. Defendants have proffered their

own sworn declarations explaining the reasoning for their actions in treating Plaintiff. In opposition, Plaintiff has not submitted disputed material facts or medical expert evidence. Accordingly, based on the uncontroverted evidence in Defendants' favor, the Court should grant the MSJ.

### 1.     Applicable Law: Deliberate Indifference to Serious Medical Needs

The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under section 1983. *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976). In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show "deliberate indifference" to his "serious medical needs." *Id.* at 104. This includes "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds by *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

To meet the objective element of the standard, a plaintiff must demonstrate the existence of a serious medical need. *Estelle*, 429 U.S. at 104. Such a need exists if failure to treat the injury or condition "could result in further significant injury" or cause "the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled in part on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)) (internal quotations omitted). Indications that a plaintiff has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

A government official is deliberately indifferent under the subjective element of the test only if the official "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Gibson v. Cnty.*

*of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)) (internal quotations omitted). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

"Deliberate indifference is a high legal standard." *Toguchi*, 391 F.3d at 1060; *see also Edmo v. Corizon, Inc.*, 949 F.3d 489, 494 (9th Cir. 2020). It "requires more than ordinary lack of due care." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)) (internal quotation mark omitted). Inadvertent failure to provide adequate care, negligence, and malpractice do not amount to deliberate indifference and do not violate the Eighth Amendment. *Estelle*, 429 U.S. at 105-06. "Medical malpractice does not become a constitutional violation just because the plaintiff is a prisoner." *Id.* at 106. Even gross negligence does not establish an Eighth Amendment violation. *Edmo*, 949 F.3d at 495. A plaintiff cannot prevail on a Section 1983 claim where the dispute is over the quality of medical treatment. *Sanchez v. Veld*, 891 F.2d 240, 242 (9th Cir. 1989); *see also Edmo*, 949 F.3d at 495. Where a plaintiff's claims arise from a course of treatment he actually received, the plaintiff must prove that the course of treatment was medically unacceptable under the circumstances and that the physician consciously chose that course in disregard of an excessive risk to the plaintiff's health. *Toguchi*, 391 F.3d at 1058. "A difference of opinion between a physician and the prisoner . . . concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012); *see also Edmo*, 949 F.3d at 495.

In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctor chose was medically unacceptable under the circumstances and that he chose this course in conscious disregard

of an excessive risk to the plaintiff's health. *Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 511 U.S. at 837).

### 2. Discussion

#### a. Defendant Saidro

The undisputed facts and medical record definitively establish the propriety of Dr. Saidro's order to have Plaintiff's warfarin treatment discontinued. Plaintiff had received warfarin treatment until his blood tests showed excessively high and dangerous INR levels. For several days, Dr. Dularte attempted to have Plaintiff take blood tests in order to measure his INR levels so doctors could gauge the dangers of continuing Plaintiff on warfarin treatment. However, Plaintiff failed to appear at two scheduled blood tests and then refused to take a blood test after the necessity for one was explained to him. Nonetheless, the medical records show that Plaintiff continued to receive his warfarin on two days during this time despite having refused to take blood tests. His warfarin was discontinued by Dr. Saidro only after Plaintiff's third refusal to take a test.

The facts and evidence establish that the blood tests were medically necessary and that the cessation of warfarin treatment was solely a result of Plaintiff's own actions. Had Plaintiff simply submitted to blood draws as he had done in the past, he very well may have been placed back on warfarin treatment if the test results showed it would be safe to do so. But because Plaintiff refused to submit to a blood draw even after being told the consequences of his refusal, Dr. Saidro's hands were tied given that Plaintiff's most recent blood test had shown excessively high and dangerous INR levels. Indeed, Dr. Saidro resumed Plaintiff's warfarin treatment when Plaintiff returned from the hospital after a blood test taken there showed INR levels would allow safe resumption of warfarin treatment. Doctors often need current and accurate data, like blood tests, to inform them in making reasonable medical treatment decisions. Indeed, Dr. Saidro may have been deliberately indifferent had she decided to continue Plaintiff's warfarin treatment in the face of Plaintiff's refusal to submit to blood tests and with knowledge that Plaintiff's most recent INR was excessively high.

In light of the undisputed facts and evidence—which show that the blame for the cessation of the warfarin treatment should rest squarely at Plaintiff's feet for his failure to submit to critical blood tests—there is no evidence whatsoever that Dr. Saidro was in any way indifferent to Plaintiff's serious medical needs. Dr. Saidro's actions were medically necessary in light of the circumstances she faced given Plaintiff's most recent blood test and refusal to take additional tests.

### b. Defendant Dr. Dularte

Even if Plaintiff's allegations against Dr. Dularte are taken as true, this would clearly be insufficient to satisfy the objective element of the deliberate indifference claim. As an initial matter, Dr. Dularte was not the one who ordered that Plaintiff's warfarin treatment be stopped, and this doctor's sole role was simply to raise concerns about Plaintiff's continued treatment in light of his refusal to have his blood drawn. In any event, suspending Plaintiff's warfarin under the circumstances presented here was clinically proper, and there is no evidence that it exposed Plaintiff to any risk of harm. Indeed, although Plaintiff had initially presented with concerning physical symptoms and was sent to two outside hospitals, tests conducted there ultimately revealed no significant medical issues.

The facts establish that Dr. Dularte made three separate attempts to have Plaintiff submit to critical blood tests required to measure his INR levels, which had previously tested excessively high and in the danger zone for continued warfarin treatment. The doctor scheduled Plaintiff for two separate blood tests for which he failed to appear. The doctor then took the step of having a nurse explain to Plaintiff why the blood test was necessary. However, because Plaintiff continued to refuse to submit to a blood test, Dr. Dularte raised concerns about continued warfarin treatment to Dr. Saidro. In light of these undisputed facts—which, again, show that the blame for the cessation of the warfarin treatment should rest squarely at Plaintiff's feet—there is no evidence whatsoever that Dr. Dularte was in any way indifferent to Plaintiff's serious medical needs. Dr. Dularte's actions were medically necessary in light of the circumstances he faced given Plaintiff's most recent blood test and refusal to take additional tests.

### 3. Conclusion

Based on the foregoing discussion, both Dr. Saidro and Dr. Dularte are entitled to summary judgment.

## B. Qualified Immunity

### 1. Applicable Law

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In general, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a violation can be made out, the next step is to ask whether the right was clearly established. *See id.* This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." *Id.* "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202 (citation omitted). Thus, the final step in the analysis is to determine whether a reasonable officer in similar circumstances would have thought his conduct violated the alleged right. *See id.* at 205.

When identifying the right allegedly violated, the Court must define the right more narrowly than the constitutional provision guaranteeing the right, but more broadly than the factual circumstances surrounding the alleged violation. *See Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir. 1995). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand [that] what [the official] is doing violates the right." *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Ordinarily, once the court concludes that a right was clearly established, an officer is not

entitled to qualified immunity because a reasonably competent public official is charged with knowing the law governing his conduct. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). However, even if the plaintiff has alleged a violation of a clearly established right, the government official is entitled to qualified immunity if he could have "reasonably but mistakenly believed that his . . . conduct did not violate the right." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001); *see also Saucier*, 533 U.S. at 205.

The first factors in the qualified immunity analysis involve purely legal questions. *See Trevino v. Gates*, 99 F.3d 911, 917 (9th Cir. 1996). The third inquiry involves a legal determination based on a prior factual finding as to the reasonableness of the government official's conduct. *See Neely v. Feinstein*, 50 F.3d 1502, 1509 (9th Cir. 1995). The district court has discretion to determine which of the *Saucier* factors to analyze first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In resolving these issues, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. *See Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003).

**2.   Discussion**

The Court finds both defendants are entitled to qualified immunity. Plaintiff has the burden of alleging a violation that has been clearly established that government officials should have been on notice. *Luna v. Ridge*, 436 F. Supp. 2d 1163, 1173 (S.D. Cal. 2006) ("Broad generalities in the articulation of the constitutional right at issue . . . are insufficient to identify a clearly established right . . .") (Burns, J.). "Except in the rare case of an 'obvious' instance of constitutional misconduct . . . [p]laintiffs must identify a case where an officer acting under similar circumstances as [defendants] was held to have violated [plaintiff's constitutional rights]." *Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (emphasis in original) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)).

As discussed above, Plaintiff has not established that a constitutional violation occurred. Defendants' cessation of Plaintiff's warfarin treatment did not amount to an obvious constitutional violation when they could not determine Plaintiff's INR levels due to his own refusal to take blood tests. Thus, Plaintiff must identify legal precedent where

an official acting under similar circumstances as Defendants was held to have violated his constitutional rights. *See Sharp*, 871 F.3d at 911. "In other words, [Plaintiff] must point to prior case law that articulates a constitutional rule specific enough to alert these [doctors] in this case that their particular conduct was unlawful." *Id.* Here, Plaintiff cannot do so, as the Court is not aware that any such case exists similar to the circumstances of this case.

## IV.   CONCLUSION

This Court RECOMMENDS that Defendants' motion for summary judgment be GRANTED, that judgment be entered in Defendants' favor, and that the case be closed.

This Report and Recommendation is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

IT IS ORDERED that **no later than February 26, 2021**, any party to this action may file written objections with the Court and serve a copy on all parties. The document shall be captioned "Objections to Report and Recommendation."

The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

DATED:  January 26, 2021

Hon. William V. Gallo
United States Magistrate Judge